UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| NUEVOS DESTINOS, LLC, | ) |
| | ) |
| AND | ) |
| | ) |
| NUEVOS DESTINOS PERU, S.A.C. | ) |
| | ) |
| AND | ) |
| | ) |
| WILLIAM P. COOK, | ) |
| | ) |
|       Plaintiffs, | ) |
| | ) |
| V. | )    CASE NO: 15-1846 |
| | ) |
| SAMUEL PECK, | ) |
| c/o SKE Midwestern, Inc., | ) |
| 1637 Parkdale Circle North, | ) |
| Erie, Colorado 80516, | ) |
| | ) |
| AND | ) |
| | ) |
| IGNACIO HARTEN RODRIGUEZ LARRAIN, | ) |
| Los Nogales 675, dpto 402, | ) |
| San Isidro, Lima 27, Peru, | ) |
| | ) |
| AND | ) |
| | ) |
| MARYSOL SALAZAR, | ) |
| Los Nogales 675, dpto 402, | ) |
| San Isidro, Lima 27, Peru, | ) |
| | ) |
| AND | ) |
| | ) |
| AGRICOLA PERUANA DEL | ) |
| SOL, S.R.L. (APS), | ) |
| Serve: | ) |
| Ignacio Harten Rodriguez Larrain, | ) |
| President | ) |
| Los Nogales 675, dpto 402, | ) |
| San Isidro, Lima 27, Peru, | ) |
| | ) |
| or | ) |

Samuel Peck,                                        )
c/o SKE Midwestern, Inc.,                           )
1637 Parkdale Circle North,                         )
Erie, Colorado 80516,                               )
                                                    )
AND                                                 )
                                                    )
EMILIO FARAH,                                       )
c/o CONVALOR S.A.C.,                                )
Cal. Carlos Ferreyros Nro. 120 Dpto. 303b,          )
San Isidro, Lima. Peru,                             )
                                                    )
AND                                                 )
                                                    )
CONVALOR S.A.C.,                                    )
Cal. Carlos Ferreyros Nro. 120 Dpto. 303b,          )
San Isidro, Lima. Peru,                             )
                                                    )
AND                                                 )
                                                    )
CONFACTOR S.A.C.,                                   )
Jr. Monterrey Nro. 373 Dpto.,                       )
601 Urb. Chacarilla del Estanque,                   )
Santiago de Surco, Lima, Peru,                      )
                                                    )
AND                                                 )
                                                    )
SKE MIDWESTERN, INC.,                               )
1111 Westrac Dr S, STE 206                          )
Fargo, ND  58103-2384,                              )
Serve:                                              )
Montgomery Goff & Bullis, P.C.,                     )
4650 38th Ave S.,                                   )
PO Box 9199,                                        )
Fargo, ND 58106-9199                                )
                                                    )
AND                                                 )
                                                    )
GIULIANA PASQUALE,                                  )
c/o Pasquale & Associates Trading Co.,              )
330 Rosemont,                                       )
La Jolla, CA 92037                                  )
                                                    )
AND                                                 )
                                                    )
C&V EXPORTS, S.A.C.                                 )

Diez Canseco 146 Of. 703                          )
Miraflores, Lima 18, Peru                         )
Serve:                                            )
Elvira D Vela,                                    )
5024 Padre Island Hwy,                            )
Brownsville, TX 78521,                            )
                                                  )
AND                                               )
                                                  )
JORGE HARTEN COSTA, SR.,                          )
c/o Estudio Rodriguez Larrain,                    )
Choquehuanca No. 770,                             )
San Isidro, Lima, Peru,                           )
                                                  )
AND                                               )
                                                  )
JORGE EMILIO HARTEN RODRIGUEZ                     )
LARRAIN, JR.,                                     )
Pasaje Olaya 169 of 307/301,                      )
Miraflores,                                       )
Lima 18, Peru,                                    )
                                                  )
AND                                               )
                                                  )
OFELIA MARIA RODRIGUEZ LARRAIN                    )
SALINAS DE HARTEN,                                )
c/o AFP Integra,                                  )
Av Canaval y Moreyna 540,                         )
San Isidro, Lima 27, Peru,                        )
                                                  )
AND                                               )
                                                  )
PERUVIAN ORGANIC INTERNATIONAL                    )
TRADING S.A.C.,                                   )
Pasaje Olaya 169 of 307/301,                      )
Miraflores,                                       )
Lima 18, Peru,                                    )
                                                  )
AND                                               )
                                                  )
JAVIER RODRIGUEZ LARRAIN SALINAS,                 )
c/o Estudio Rodriguez Larrain,                    )
Choquehuanca No. 770,                             )
San Isidro, Lima, Peru,                           )
                                                  )
AND                                               )

**GONZALO RODRIGUEZ LARRAIN
de LAVALLE,**
c/o Estudio Rodriguez Larrain,
Choquehuanca No. 770,
San Isidro, Lima, Peru,

AND

**JAVIER URTEAGA,**
c/o COLLINSVILLE CORP SUCURSAL DEL
PERU,
Antonio Pezet 131 piso 4,
San Isidro, Lima, Peru,

AND

**MANUEL VIDAURRE,**
Agro Industrias Sacovelo SAC,
Av. de Aliaga Juan Nro. 150,
San Isidro, Lima, Peru,

AND

**FELIPE BEDREGAL,**
Pasaje Olaya 169 of 307/301,
Miraflores,
Lima 18, Peru,

AND

**NILTON PALACIOS POZO,**
Pasaje Olaya 169 of 307/301,
Miraflores,
Lima 18, Peru,

AND

**ANTONIO SALAZAR SALAZAR,**
Av Salavery 3575,
Urbanizacion Orrantia,
San Isidro, Lima 27, Peru,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT

Plaintiffs Nuevos Destinos, LLC ("NDL"), Nuevos Destinos Peru, S.A.C. ("NDP"), and William P. Cook ("Cook") (collectively, "Plaintiffs"), by and through the undersigned counsel, assert the following against Defendants:

## JURISDICTION AND VENUE

1.      In their federal claims for relief, Plaintiffs allege violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 United States Code §§ 1961 *et. seq.* This Court has jurisdiction over Plaintiffs' federal claims pursuant to 18 United States Code § 1964 (a) and (c), 28 United States Code § 1331, and 28 United States Code § 1337.

2.      In their state claims for relief, Plaintiffs allege violations of common law conspiracy, fraud, and breach of contract.  This Court has jurisdiction over Plaintiffs' state claims pursuant to 28 United States Code § 1367.

3.      Personal jurisdiction and venue in this district are proper pursuant to 18 United States Code § 1965(a) and (b), and 28 United States Code § 1391(b)(2), because many of the events that were undertaken by Defendants against Plaintiffs were done so while Plaintiffs resided and did business in this district, and many of the wrongful actions were targeted at Plaintiffs in this district.

## NATURE OF THE CASE

4.      Plaintiffs bring this lawsuit to vindicate their rights that were violated as a direct and proximate result of unlawful actions committed by Defendants between 2012 and the present date.  Defendants' actions constituted a scheme and conspiracy to defraud, designed to illegally

amass vast sums of money and property while maintaining the appearance, pretense, and façade of propriety.

5.      To operate this scheme, Defendants created an ongoing, association-in-fact racketeering enterprise (the "Enterprise") to conduct a pattern of racketeering activity.  As associates in the Enterprise, Defendants' racketeering activity included committing various federal crimes, such as (1) mail fraud; (2) wire fraud; and (3) money laundering.  Additionally, Defendants committed several state crimes, including but not limited to (1) common law conspiracy; (2) fraud; and (3) breaches of contracts.  Defendants committed these crimes for the common purpose of unlawfully enriching themselves and preserving their ill-gotten wealth, and these crimes affected both interstate and international commerce.

6.      The racketeering activity herein complained was engineered by Ignacio Harten Rodriguez Larrain ("Harten") and Samuel Peck ("Peck") and began when they commandeered Agricola Peruana Del Sol, S.R.L. ("APS") and SKE Midwestern, Inc. ("SKE"), two otherwise legitimate business entities, and used them to defraud Plaintiffs and others by making false promises to sell agricultural goods to these purchasers.  Involved in this racketeering enterprise were individuals Marysol Salazar, Emilio Farah, Giuliana Pasquale, Jorge Harten Costa, Sr., Jorge Emilio Harten Rodriguez Larrain, Jr., Ofelia Maria Rodriguez Larrain Salinas de Harten, Javier Rodriguez Larrain Salinas, Gonzalo Rodriguez Larrain de Lavalle, Manuel Vidaurre, Felipe Bedregal, Nilton Palacios Pozo, Antonio Salazar Salazar, as well as other companies such as C&V Exports, Convalor S.A.C., Confactor S.A.C., and Peruvian Organic International Trading S.A.C., as well as various other persons and entities that may or may not have been complicit in the frauds and other wrongdoing perpetrated by Harten and Peck.

7.      While Plaintiffs and other unwitting victims sustained considerable damages through the fraud and wrongdoing perpetrated by Harten, Peck, and their co-conspirators, the Enterprise generated substantial income and unlawful profits for Defendants.  These tainted funds were then used for various purposes, but primarily to unlawfully enrich certain individual Defendants.  Subsequently, Defendants engaged in various artifices to preserve their ill-gotten wealth.

8.      Plaintiffs NDL, NDP, and Cook bring this action on their own behalf, based upon the substantial losses and economic harm they suffered from the Enterprise and the illegal actions of Defendants.  Plaintiffs seek treble damages, costs of this litigation, attorneys' fees, punitive damages, and any other equitable relief that may be appropriate.

## PARTIES AND OTHER INVOLVED PERSONS AND ENTITIES

A.      Plaintiffs

9.      Plaintiff Nuevos Destinos, LLC ("NDL") is a company registered in Florida with its nerve center and principle place of business during the relevant period of time when the frauds and other wrongdoings occurred in the District of Columbia and presently in Virginia.  It is a U.S. company that purchases agricultural products (particularly Sesame Seeds, Quinoa, and Amarand) from Peru, for export from Peru and delivery to the United States and other countries.  NDL entered the business initially by providing pre-production financing for a Peruvian company that processed Quinoa, Amarand and Sesame Seeds in Peru and then exported it to the U.S. and other countries around the world.  The principals of NDL are Ileana M. Boza and William P. Cook.  Mr. Cook is a U.S. citizen and Ms. Boza is a citizen of Peru and a U.S. legal permanent resident.  Mr. Cook and Ms. Boza are married.  At all times relevant to this matter,

they lived in Washington, D.C.  They later moved to Arlington, Virginia, and currently reside in Alexandria, Virginia.

10.     Plaintiff Nuevos Destinos Peru, S.A.C. ("NDP") is a company organized in Peru with its nerve center and principle place of business during the relevant period of time when the frauds and other wrongdoings occurred in the District of Columbia and presently in Virginia.  It is a Peruvian company and affiliate of NDL, that serves as the purchasing agent for Plaintiff NDL in Peru, and in that capacity purchased agricultural products from Peru on behalf of NDL, for export from Peru and delivery to the United States and other countries.

11.     Plaintiff William P. Cook ("Cook") is a citizen of the United States and an individual resident of the Commonwealth of Virginia.  Cook personally financed all of the agricultural transactions by which Plaintiffs were defrauded.

B.     Defendants

12.     Defendant Samuel Peck ("Peck") is a United States citizen residing in the State of Colorado.  Peck is the founder and majority shareholder of APS, and is currently and was at all times relevant to this matter, the Vice President and chief buyer for SKE Midwestern.  Peck is a well-known buyer and seller of beans and other agricultural products throughout the world.  Peck and his partner Ignacio Harten Rodriguez Larrain worked together to defraud numerous purchasers including Plaintiffs.  While Harten was the "front man," Peck was his accomplice posing as a neutral and uninterested party.  Peck personally vouched for Harten with Plaintiffs even though he knew that Harten had engaged in substantial fraud of SKE.  Peck was at all times relevant hereto the majority owner of APS and, along with Defendants Jorge Harten Costa, Sr. and Jorge Emilio Harten Rodriguez Larrain, Jr., a designated agent ("Apoderado") of APS, both

facts that Peck intentionally concealed from Plaintiffs in order to hide and further his conspiracy with Harten.

13.     Defendant Ignacio Harten Rodriguez Larrain ("Harten"), is a citizen of Peru who, upon information and belief, presently resides in the United States.  Harten is the General Manager of Defendant APS and had been in the agricultural exporting business for many years. According to information provided by him and Peck, and confirmed by publicly available records, his company APS had processed and exported more than 120 containers of agricultural product, including Quinoa and Black Eye Peas, in 2010.  Harten comes from one of Peru's more prominent families.  Taking advantage of these family connections and the appearance of legitimacy provided as a result of them, Harten is the central mastermind behind, and controller of, the Enterprise exposed herein.  Harten regularly transacts business in the United States.

14.     Defendant Marysol Salazar ("Marysol") is the wife of Harten who assisted Harten in furthering his schemes to defraud many purchasers such as Plaintiffs by using her family contacts and accompanying Harten on his meetings to lure purchasers into these schemes.

15.     Defendant Agricola Peruana Del Sol, S.R.L. ("APS"), is a Peruvian company with its principle place of business in Peru.  APS exports agricultural products to, among other countries, the United States.  APS was the corporate vehicle used by Peck and Harten, among others, to defraud Plaintiffs and others.

16.     Defendant Emilio Farah ("Farah") is a native and citizen of Peru and a principal of a Peruvian companies Convalor, S.A.C. ("Convalor") and Confactor S.A.C. ("Confactor") [collectively "Convalor/Confactor"].  Farah is a well-known Peruvian businessman who wanted to buy, process, and sell agricultural products in concert with NDL and introduced Plaintiffs to Harten.  Upon information and belief, Farah had been defrauded by Harten and, as a result, Farah

was trying to recoup his and Convalor/Confactor's $1.5 million in losses, and assisted Harten to defraud Plaintiffs, by introducing them to Harten and APS. Upon information and belief, in return for his support of the schemes, Farah has received a return of some of his and Convalor/Confactor's $1.5 million in funds from Harten, including money defrauded from Plaintiffs.

17.     Defendant SKE Midwestern, Inc. ("SKE"), is a U.S. company registered in North Dakota with its nerve center and principle place of business in the State of North Dakota. SKE is a beans broker, supplier, importer, processor and shipper. It is a medium-sized company with over 20 years of bean experience in international markets. SKE lost money to frauds perpetrated by Harten and APS prior to its introduction to Plaintiffs, and was trying to recoup its losses by assisting Harten to defraud others including Plaintiffs.

18.     Defendant Giuliana Pasquale ("Pasquale") is a resident of the United States and was an employee of APS. Pasquale assisted Harten and Peck in defrauding Plaintiffs.

19.     Defendant C&V Exports, S.A.C. ("C&V Exports") is a U.S. company that exports agricultural products from Peru that assisted Harten in his defrauding of Plaintiffs.

20.     Defendant Jorge Harten Costa, Sr. ("Jorge Sr.") is a Peruvian citizen, who is the father of Harten and a designated agent ('Apoderado') of APS who assisted Harten in perpetrating the fraud on Plaintiffs and attempting to cover up those frauds once the frauds were revealed.

21.     Defendant Jorge Emilio Harten Rodriguez Larrain, Jr. ("Jorge Jr.") is a Peruvian citizen, who is the brother of Harten and a designated agent ("Apoderado") of APS who assisted Harten in perpetrating the fraud on Plaintiffs and attempting to cover up those frauds once the frauds were revealed.

22.     Defendant Ofelia Maria Rodriguez Larrain Salinas de Harten ("Ofelia") is a citizen of Peru, the mother of Harten, and the nominal public head of and 60% shareholder of Peruvian Organic International Trading S.A.C. ("POIT"), the successor in interest to APS. Ofelia allows Harten to run POIT and continue his fraudulent schemes through that company, while purporting to give POIT legitimacy.

23.     Defendant Peruvian Organic International Trading S.A.C. ("POIT") is a Peruvian company that is the successor in interest to APS. POIT has continued the fraudulent schemes of APS and Harten without the baggage of having been disclosed as a company that engages in sham transactions. POIT is owned 60% by Harten's mother Ofelia and 40% by Harten's brother, Jorge Jr., POIT's nominal General Manager and former Apoderado of APS, but is run on a day to day basis by Harten himself.

24.     Defendant Javier Rodriguez Larrain Salinas ("Javier") is a Peruvian citizen who is Harten's uncle (Harten's mother's brother), who was one of APS's early victim purchasers. Javier has since joined Harten in defrauding others so that Harten and APS can return the approximately $500,000 that they stole from Javier, including specifically vouching for Harten to Plaintiffs upon their introduction to Harten by Farah, even though Javier knew that Harten had already defrauded Javier out of $500,000. Javier was at the first meeting between Plaintiffs and Harten in April 2012 and vouched for Harten. Upon information and belief, in return for his support of the schemes, Javier has received a return of some of these funds from Harten, including money defrauded from Plaintiffs.

25.     Defendant Gonzalo Rodriguez Larrain de Lavalle ("Gonzalo") is a Peruvian citizen who is a relative of Harten and was one of APS's early victim purchasers. Gonzalo has since joined Harten to assist him in defrauding others so that Harten and APS can return the

approximately $100,000 that they stole from Gonzalo, including specifically vouching for Harten with intended Harten and Peck victim Oscar de Osma, even though Gonzalo knew that Harten had already defrauded Javier out of $500,000, and himself Gonzalo out of $100,000. Upon information and belief, in return for his support of the schemes, Gonzalo has received a return of some of these funds from Harten, including money defrauded from Plaintiffs.

26.     Javier Urteaga ("Urteaga") is a Peruvian citizen who was one of APS's early victim purchasers. Urteaga freely and willingly accepted money from Harten and APS as the return of the money that they stole from Urteaga and his daughter's company, Collinsville Corp. Sucursal Del Peru, even though Urteaga knew that Harten was not actively exporting product during that time period and could only have obtained the funds returned to Urteaga by stealing money from the Plaintiffs and others in furtherance of the scheme. Urteaga knew that Harten had already defrauded Urteaga and his daughter's company, Collinsville Corp. Sucursal Del Peru, out of $2 million. Upon information and belief, Urteaga has received a return of some of these funds from Harten, including money defrauded from Plaintiffs. Urteaga knew or should have known that Harten was repaying Urteaga with money that Harten was obtaining by defrauding others.

27.     Defendant Manuel Vidaurre ("Vidaurre") is a Peruvian citizen who was the General Counsel of APS and specifically vouched for and assisted Harten in his scheme to defraud Plaintiffs.

28.     Defendant Felipe Bedregal ("Bedregal") is a Peruvian citizen who was the internal accountant for APS and is currently the internal accountant for POIT. Bedregal specifically vouched for and assisted Harten in his scheme to defraud Plaintiffs.

29.    Defendant Nilton Palacios Pozo ("Pozo") is a Peruvian citizen who was an employee of APS and allowed his bank account to be used by Harten to launder money for APS and Harten.

30.    Defendant Antonio Salazar Salazar ("Salazar") is a Peruvian citizen who was the chief of APS's "Northern Operations" in Piura, Peru and assisted Harten in defrauding Plaintiffs. Salazar is the brother of Marysol and thus, the brother-in-law of Harten.

## FACTS

### I.    Background and Jurisdiction

31.    Prior to 2011, NDL financed exporting companies in Peru. In 2011, NDL decided that commencing in 2012 it would begin buying product directly from agricultural producers and would take over the selling and exporting responsibility itself, in lieu of financing other exporting companies in Peru.

32.    In April of 2012, NDL was introduced to Harten, the General Manager of the Peruvian company APS by Farah, a well-known Peruvian businessman who wanted to buy, process, and sell agricultural products in concert with NDL. Farah told NDL that he had worked with Harten before (he mentioned that he had just entered into a contract with APS a few months earlier for the sale and export of Chia seeds from Peru) and that he had a good experience with Harten and APS. He also said that Harten was one of the largest exporters of bean products in Peru in 2010 and 2011, and was honest, well-connected, and came from a prominent Peruvian family. At all times relevant to this case, NDL was operating from Washington, D.C., and later in Arlington, VA (though it remained registered in Florida at all times).

33.    From August 3-13, 2012, Harten and his wife Marysol came to the U.S., *inter alia*, to meet in person with NDL, for which they traveled by train from N.Y. to Washington,

D.C.  Their trip to Washington, D.C. followed a meeting Harten had earlier on his business trip with Wes Fong, the President of SKE Midwestern, in New York.

34.     During the subsequent meeting with NDL, Harten stated that he had just met with Fong and had confirmed that everything was on track with regard to the SKE purchase order he was in the U.S. asking NDL to continue to fund (see below for details on SKE's role in this case).

35.     During that time period, Peck sent an email to NDL indicating he was looking for Harten because he had to speak to him about the Black Eye Peas and some new business he wanted to place with APS; thereby seeking to provide credibility to Harten and the fraudulent SKE deal, in furtherance of their joint fraud against the Plaintiffs.

## II.     The Fraudulent APS Transactions

36.     Commencing in May 2012, NDL entered into its first transaction with APS.  The contract with APS was for the purchase of organic Quinoa, together with Farah.  Subsequently, that lead to other contracts between NDL and APS (without Farah) for products such as conventional Quinoa (SCI Corporation); Black Eyed Peas (SKE Midwestern; Bharti Walmart); Dried Corn and Baby Limas (Western Trading); and Fava Beans (Southwest Agra).[1]

37.     The total amounts disbursed by NDL to APS for the purchase of the products listed below, were solely for the benefit of NDL or its customers; or for customers for whom Harten led NDL to believe APS had specific purchase orders, including SKE (which NDL later found out to be largely false):

---

[1]     Other than Bharti Walmart, all of the sales were to U.S. customers.

**Table 1.0**

**Disbursements made by NDL to APS and the products allegedly bought**

(a) Frijoles Castilla[2]        $530,000 (to buy, process and ship 1,000 MTs; only 24 MTs

actually delivered by APS to NDL);

(b) Organic Quinoa        $565,000 (to buy 286.6 MTs; 0 MTs actually delivered to NDL);

(c) Conventional Quinoa[3]        $240,000 (to buy, process and ship 120 MTs; 0 MTs actually

delivered by APS to NDL);

(d) Mote Pelado[4]        $204.600 (to buy, process and ship 120 MTs; less than 20 MTs

actually delivered by APS to NDL); and,

(e) Fava Beans        $45,000 (to buy, process and ship 40 MTs; less than 20 MTs

actually delivered by APS to NDL)

The total provided to APS for product purchase was $1,584,600 to buy 1,566.6 metric tons of

product.  Less than 64 metric tons of product was ever delivered to NDL.

38.        Harten and APS claimed the product was bought in sworn notarized statements

provided to NDL in February 2013 in response to notarized letters sent by NDL to APS

demanding to know when the purchased product would be delivered.  In addition, NDL

disbursed to APS another $24,500 ($21,500 to commission the construction of a Quinoa

processing plant, and another $3,000 for joint NDL/APS marketing expenses related to the Expo

Alementaria in Lima at the end of September 2012).

---

[2]        Also known as "Black Eye Peas."

[3]        Conventional Quinoa has been cultivated with pesticide and chemical fertilizer and is thus not organic.

[4]        Also known as "Sun-Dried Corn."

39.    In order to fund the foregoing transactions, a total of $1,609,100 was sent from NDL's account in the U.S. via bank wire transfers to each of Banco del Credito de Peru (12 separate transfer amounts) and BBVA Banco Continental (7 separate transfer amounts), where APS held accounts.

III.    **Lost NDL profits due to the APS fraud based on signed contracts NDL had in hand**

40.    NDL suffered a profit loss of $586,690 based on the contracts it had in hand for the products NDL sold to Western Trading (Mote Pelado), SKE (Black Eye Peas), Sierra y Selva and SCI Corporation (Organic and Conventional Quinoa), and Southwest Agra (Fava Beans). This does not include the loss of future business and the destruction of NDL's reputation with customers.

**Additional Losses/Expenses of NDL**

41.    Due to the fraud by APS, even the little product it provided to NDL was never delivered on time. For the few shipments that did finally arrive, APS claimed it did not have the funds to ship the product, even though funds to cover the shipping and other logistical costs had previously been provided to APS by NDL to procure, process, and ship the products specified above. As a result, NDL had to put up an additional $17,100 for logistics and maritime freight to get the late delivered 64 metric tons in product to its customers.

42.    Further, due to the failure of APS to deliver the rest of the Mote Pelado to NDL (5 containers or 100 metric tons), NDL's customer Western Trading sent notice to NDL of a default claim against NDL in the amount of the $13,200 it cost Western Trading to procure a replacement container of product needed for it to meet its own customers order for the Mote Pelado it had already sold.

43.     NDL has to date incurred more than $50,000 in legal fees which continue to rise in its attempts to get its money returned, or the product delivered.

44.     During 2012, APS produced a very limited number of containers on behalf of NDL. A review of all of the transactions in question demonstrate that these were:

**a.     Organic Quinoa (Reference (b) in Table 1.0)**

45.     In May 2012, NDL provided $565,000 to APS to buy 286.6 MTs of Organic Quinoa, as part of a $1.130 million deal in which Farah "participated." <u>No Organic Quinoa was ever delivered to NDL</u>.

46.     In furtherance of the fraud, in July 2012, Harten arranged for an NDL representative to be shown the warehouse purportedly holding part of the Organic Quinoa that APS had allegedly "purchased" on behalf of NDL. NDL later learned from an APS employee in 2013 that the Organic Quinoa that the NDL representative was shown was Quinoa that APS had not paid for. In fact, the Organic Quinoa shown to NDL belonged to a third party unrelated to Harten and APS. NDL had no way to know of the fraud at that time. In December 2012, NDL arranged to sell the organic quinoa to Sierra y Selva. Given that the price of organic quinoa increased substantially (nearly doubled), NDL could have recovered all its investment and even doubled its money if APS and Harten had provided the product between December 2012 and March 2013. Despite repeated promises to do so in writing, Harten, Peck and APS never produced any of the organic quinoa.

**b.     Conventional Quinoa (Reference (c) in Table 1.0)**

47.     Harten approached Plaintiffs to fund the purchase of six containers of Conventional Quinoa for sale by APS to a U.S. company called SCI Corporation (a well-known U.S. importer of quinoa from Peru, and a company which NDL had done business with in its

prior funding relationship with Grupo Organico). NDL provided Harten $240,000 to fund the purchase order he provided to NDL from SCI for the purchase, processing, and shipment of those 6 containers of conventional quinoa to SCI.

48.     Harten provided NDL's funds to a Peruvian company named C&V Exports, owned by a man named Cesar Valdivia, a Peruvian-U.S. citizen who lives in California and in Lima, Peru. It was Valdivia's company and not APS that had the contract with SCI. Harten and C&V Exports planned to use NDL's money to fill the SCI contract and then pocket the money from SCI without ever paying NDL.

49.     When it came time for NDL to be paid by APS, Harten stalled by saying that while APS had shipped the first 3 containers, SCI had not paid for them yet; and that it was taking longer than he expected for the second 3 containers due to processing problems. After several weeks of these excuses, NDL demanded payment and threatened to go to SCI directly, as it had its own contacts at the company. At that point, Harten informed NDL that he had never had the SCI contract and disclosed C&V Exports' involvement to NDL for the first time.

50.     NDL stated that whatever had transpired, APS and Harten then owed NDL $288,000, due immediately. Harten said that while C&V Export had finally been paid by SCI Corporation, it was only for the 3 containers delivered. Harten said C&V Export would not pay APS any money, claiming it was owed more than this amount from APS for a prior deal gone bad.

51.     Harten agreed to provide the 3 containers of unsold quinoa, and eventually APS paid NDL $29,910 in October 2012 toward the balance owed on the $144,000. He made an additional payment of $15,000 in November 2012, but has never paid anything further.

52.     At that point, NDL was still owed a balance of $243,090, plus interest, as the 3 containers of "unsold" Quinoa were never delivered to NDL either (see below).[5]

53.     Part of the $243,090 owed was reduced when APS provided NDL 4 containers of Baby Limas for export to Western Trading [Reference (e) in Table 1.0, at no cost to NDL].  The Baby Limas cost $75,000, including processing, transportation, insurance and freight.  But APS failed to pay for the transportation, insurance, freight, and port processing fees, as it agreed it would; and NDL had to assume those logistical costs, thereby reducing the value of the offset to NDL by approximately $17,000 (from $75,000 to $58,000), leaving, as a result of the fraud of APS, a net balance due to NDL of $185,090 on the 6 containers sold to SCI).

54.     Over the course of the next 9 months, NDL continued to pursue Harten for the balance of $185,090, and/or the 3 containers of conventional quinoa that APS and Harten continued to maintain (along with similar representation by Jorge Sr. and Peck) that APS had in its possession.  Harten and Peck would continually promise to deliver the 3 containers of conventional quinoa, and claimed they were safe and sound at the facility of APS' processor, outside of Lima.

55.     In the interim, NDL was hearing representations from Harten, Jorge Sr, and Peck that the quinoa would be delivered as promised.  As a consequence, and in an attempt to get its money back, NDL offered to sell the 3 containers of conventional quinoa to Sierra y Selva, S.A. the largest quinoa processor and exporter in Peru for a considerable premium since at that point in 2013, quinoa was in very short supply.  The price that Sierra y Selva offered to buy NDL's

---

[5]     The $29,910 NDL received in partial payment of the $288,000 it was owed for the quinoa came not from the APS corporate account but from the personal bank account of Nilton Palacios Pozo, the employee of APS hired by Jorge Sr. to "keep an eye" on Harten for his father, information NDL found out in 2013.  Farah disclosed to NDL in 2013 that Harten sometimes had him put the money Farah was giving APS to fund product purchases into Pozo's personal account and not the APS corporate account.  NDL later spoke to APS insiders who confirmed what Farah had told NDL and said that Harten used Pozo's account to launder and hide stolen APS customer money, which he later illegally converted to his, Peck's and other APS insider's own personal use.

conventional quinoa was more than enough to permit NDL to recover the balance of the

$185,090 APS owed it, due to the premium Sierra y Selva was prepared to pay for the product.

56.     The 3 containers were never delivered to NDL nor was any further money paid,

and at one point Harten had the temerity to say he was refusing to provide either the money or

the product because he said NDL had questioned his integrity, all the while knowing that he had

never bought the product to begin with.

57.     NDL was eventually able to track down the supplier of the conventional quinoa

on its own and learned that Harten and C&V Exports never bought 6 containers, but only bought

3 containers.  Thus, the claims by Harten, Jorge Sr., and Peck that the 6 containers of

conventional quinoa had been bought were completely false, which was easily known to them as

Apoderados of APS, but they never personally went to the purported warehouse allegedly

holding the 3 containers to confirm that they had actually been bought by Harten before making

the statements that he had in fact bought them and would deliver them as promised.  Having only

purchased 3 of the containers for which NDL only received $44,910; of equal import is that in

not making the second purchase of the remaining 3 containers of conventional quinoa, Harten

and APS stole outright the $120,000 NDL paid for those other 3 containers that NDL

commissioned to have Harten and APS to buy.[6]

c.      **Frijoles Castilla (Reference (a) in Table 1.0)**

58.     As mentioned in Table 1.0, NDL gave a total of $530,000 for the purchase and

export of black eyed peas under a contract purchase order for SKE, which NDL agreed to

---

[6]     The supplier of the conventional quinoa sold to SCI also complained to NDL that she had to chase after
Harten and Valdivia for months to get paid for the 3 containers she had provided them, despite the fact that Harten
had more than enough money to pay her since NDL had provided $240,000 for the purchase, processing and
shipment of 6 containers (when they had only purchased 3 from her).  In the end, she refused to sell Harten and
Valdivia the second 3 containers of conventional quinoa unless they paid for it in advance, which they refused to do.

finance between May and September, 2012 for exports beginning in September 2012.  APS never bought the product, much less ever exported the containers under the SKE contract, and SKE never intended to honor the contract in the first place.

59.     When NDL started pressing Harten for when the product was going to ship to SKE, he and Peck first claimed problems at the APS plant in Piura were at the root of the problem.  When NDL later insisted on seeing the plant, the "plant" turned out to be nothing more than a storage garage with minimal equipment inside of it, clearly insufficient to process 2000 MTs of product called for in the SKE purchase order.  Salazar was the APS employee who allegedly ran this plant and had vouched for the APS plant's capacity.

60.     In a subsequent call with Peck in early 2013 in which NDL confronted him with how could APS produce the required product under the SKE purchase order without a proper processing plant,[7] Peck admitted to NDL that he and Harten had cooked up a plan whereby APS would seek funding based on facially valid SKE purchase orders, but that once the money was raised, SKE would cancel the order and APS would keep the money to fund the effort by Harten and Peck to repay money that Harten had stolen from SKE in 2011 (see details below).

61.     It was only in 2014 that Harten admitted he never bought the product for the SKE contract.  To this day, however, he refuses to give any details as to where or on what he spent the $530,000 given APS by NDL for that contract.

62.     During the entire term of its interactions with APS, NDL was delivered only one container of frijoles Castilla (black eye peas) consigned to NDL's customer Bharti-Walmart in

---

[7]     In addition, Plaintiffs questioned Harten and Peck about where they were processing and storing all of the Black Eye Peas they claimed to have purchased for the SKE contract.  They stated that in addition to their plant in Piura, they had another processing plant in Chiclayo.  When NDL went to visit the Piura plant in October 2012 to check on the progress of the processing of the SKE product, it only found product sufficient for 3-5 containers, not the 50 containers or 1000 metric tons expected.  Harten and Peck insisted the balance of the 50 containers were in storage, a few hours away, but refused to permit NDL to do a site visit, alleging logistical difficulties.  In reality, the product had never been bought by Harten, Peck, or APS.

India.  But, APS did not pay the shipping, insurance or port fees, as they were required to do under the purchase order between APS and NDL, and for which APS had already been paid. NDL received $28,184 from Bharti-Walmart.

63.     NDL was later to learn that Harten and APS next used NDL's money, earmarked for the SKE contract, to export two containers of Black Eye Peas to Pride Marketing in California, for which APS was paid $56,160.  All of this was concealed by APS from NDL. When NDL learned of this misuse of its funds, it contacted Pride Marketing and sent it written notice via email that its funds had been used to buy its products via email, but Pride Marketing refused to pay NDL insisting that it was dealing with Defendant Giuliana Pasquale on that sale and that she had directed that the funds due on the shipment were to be sent to the account of APS.  Despite repeated promises to pay NDL the $56,160 received from Pride Marketing, neither APS, Harten, nor Pasquale ever paid anything on that account to NDL.

**d.     Baby Limas and Fava Beans (Reference (e) of Table 1.0)**

64.     NDL received for its customer Western Trading four (4) containers of Baby Limas provided by APS for which NDL received a payment of $89,048.31.  NDL customer Southwest Agra received one container of fava beans provided by APS, but this container was delivered with a month of delay.  The second container purchased by NDL was never delivered, although for several weeks Harten told NDL the beans were ready and on their way to the Port of Callao.  NDL received only $35,382.97 for the one container.  In both cases, APS did not pay the logistical expenses associated with those products and NDL was forced to spend additional money to insure that those customers received their product (despite the fact that APS had already been paid by NDL to cover those logistical expenses).

e.    **Mote Pelado (Reference (d) of Table 1.0)**

65.    NDL and APS signed an agreement in early October 2012 under which APS agreed to purchase, process, and ship 120 metric tons of Mote Pelado to NDL's customer Western Trading.  Despite repeated assurances by Harten, Peck, and the APS attorney Manuel Vidaurre that they had purchased the product and that it would be delivered, to date, APS only produced less than 20 MTs of Mote Pelado.  After repeated requests and meetings, APS, Harten, Peck, and Vidaurre, APS's General Counsel, have never presented evidence that the rest of the product was ever bought with NDL's money, though all made numerous statements that such was the case, both verbally and in emails.  Similarly, Peck provided numerous assurances by e-mail about this Mote Pelado.  All NDL received from Western Trading was $41,322.29 as a reduced payment for the less than 20 MTs of Mote Pelado delivered by APS to it on behalf of NDL (they claimed what they received was shorted and that the weight was only 19.7 metric tons).

IV.    **How Did APS Perpetuate Its Fraud?**

66.    The key to understanding how APS defrauded, and how Harten and Peck continue to defraud so many otherwise intelligent and capable businesspeople and companies lies in the genesis of their relationship.

67.    According to disclosures Peck made to NDL in early 2013, he decided to form APS in 2007 with Harten after doing some business with him on behalf of SKE.  Peck said he created APS because he and SKE wanted to exercise control over Harten, and wouldn't be able to do that unless Peck, on behalf of SKE, owned the corporate entity they were doing business with in Peru.

68.     Originally, APS was majority owned by Peck (36.36%) and two other U.S. citizen friends of Peck, Stephen Gorham Benson and Ryan Andrew Benson, who owned, between the two Bensons, a total of 45.45%, with Harten only owning a very small percentage of the Company (9.09%).

69.     Jorge Sr. chartered the Company in Lima, Peru, appointing himself, Jorge Jr., Peck, and Stephen Benson as Apoderados ("proxies" or "agents"), and Harten as the General Manager.  But initially, Harten's authority to run the Company and withdraw funds from its various bank accounts was very limited.  By the design of Jorge Sr., a Peruvian lawyer, the Apoderados had complete oversight of the Company's operations.  In order for Harten to take any funds from the Company's accounts required Jorge Sr., Peck, or Jorge Jr. to co-sign the check or cash withdrawal, Peck and SKE, confident that sufficient safeguards were in place, embarked on a series of purchase orders with APS and Harten, providing him and APS an aggregate of $1 million to purchase agricultural products, primarily Black Eye Peas.

70.     Initially, APS delivered a small amount of SKE's product.  As time went on, however, it started defaulting on its promised delivery schedule and eventually ceased delivering product entirely.

71.     Peck, then confronted Harten about why SKE was not getting its deliveries. According to Peck, Harten claimed that he had failed to buy the product at the agreed upon price on a timely basis and that subsequently the market prices more than doubled and that he needed $1 million more in additional funds from SKE to be able to meet its orders (which SKE needed to meet their own commitments to customers).

72.     Faced with defaulting its own customer contracts, according to Peck, SKE reluctantly gave APS the additional $1 million in funds; but in the end, little if any of the product

was ever delivered by APS to SKE, according to Peck.  Harten never disclosed to Peck what he did with SKE's money, but NDL was later to find out that Harten was a compulsive gambler and former drug addict, and sources told NDL in December 2012, and Wes Fong, President of SKE confirmed in early 2013, that at the time in question involving SKE and Peck prior to their introduction to Plaintiffs, Harten owed money to a number of Lima's casinos.

73.     Thereafter, Peck was told by his boss Wes Fong of SKE that his job was on the line and to do whatever it took to get the Company's money back from APS and Harten.

74.     In May of 2011, SKE recorded an accumulated loss of $3.6 million, according to Fong and Peck.  Shortly after this recognition of debt due to SKE by Harten and APS, Jorge Sr. modified the charter of APS, and made two changes: (1) a capital increase in May 2011 through a purported recapitalization of debts; and (2) in July 2011, he changed the power of the Apoderados allowing Harten to operate without any oversite from Jorge Sr., Jorge Jr., or Peck. Benson was dropped as an Apoderado when his stock was reduced as a result of the capital call.

75.     The capital increase in May 2011 allegedly recapitalized the Company's debt. Peck's portion of the Company's equity increased to 50.08%; Harten's share of the Company increased to an unfathomable 49.71%; and, the Bensons dropped to 0.21% ownership of the Company.  In 2013, Peck explained this anomaly of increasing Harten's share of APS as being necessary to "incentivize Harten" to work to recover SKE's lost $3.6 million.

76.     Faced with losing his job, Peck soon thereafter cooked up a scheme with Harten whereby Peck would issue facially valid purchase orders on behalf of SKE and then Harten would shop them around to financing sources in Lima and abroad.  At one point, Harten and Peck had 6 purported SKE purchase orders hanging on a board in the APS office in Lima, visible on entry to the office by any visitors, including the Plaintiffs.

77.    In July 2011, solely to support this new scheme, Jorge Sr. further changed the charter of the Company making Harten the sole signatory on all of the APS accounts, and listing himself, Peck, and Jorge Jr. as only being able to act as Apoderados on behalf of the Company in the event Harten was incapacitated.

78.    Having removed all oversight and control over the APS accounts, Jorge Sr. loosed Harten on the local and international business community to be able to steal the millions of dollars as follows below.

79.    Starting with Harten's relatives, his uncles Javier Rodriguez Larrain Salinas ($500,000) and Gonzalo Rodrigues Larrain de Lavalle ($100,000), Harten and Peck started selling them to provide funding for APS on the theory that the margin for filling the SKE orders were so high because Harten and APS had local farmers who sourced them their product and APS had its own processing plant in Piura (run by Salazar, the brother-in-law of Harten and the brother of Raul Salazar, then the Chief of the Peruvian National Police and Harten's brother in law), so the costs were low and the market prices high.

80.    Following the frauds on his family, Harten and Peck in 2011 raised an additional $2 million from Javier Urteaga, plus another $300,000 from Alex Von Ehren, both Peruvian businessmen.

81.    In early 2012, they next raised $1.5 million from Farah, the first $300,000 in March 2012 supposedly being for a contract to process and export Chia seeds from Peru.

82.    Following the fraud they perpetuated on NDL in 2012, Harten, Peck, and APS then sought to raise $2 million in 2013 from Oscar de Osma, another Peruvian businessman[8].

---

[8]    Harten and Peck, already fleeing APS due to the inquiries of NDL about its funds and/or undelivered product, in February 2013 created a new Peruvian company called Mr. Grains & Cereals Products, SAC for their project with Oscar de Osma. The owners of this new fraudulent enterprise included Gonzalo Rodriguez Larrain de

This attempted fraud was thwarted when NDL warned de Osma of its own concerns with Harten, Peck and APS, when it learned of their approach to him to do business with him. When NDL met with de Osma to warn him, he disclosed to NDL that both Harten and Peck had sought to entice him to provide them funding, at a lunch, using the same *modus operandi* that Harten and Peck had used with NDL in May, 2012.

83.     After NDL foiled APS's attempt to solicit de Osma, Harten and Peck then sought to shut down APS; and Harten and his family then formed a new company called Peruvian Organic International Trading S.A.C. ("POIT") with Harten's mother Ofelia Rodriguez Larrain de Harten as a 60% shareholder, and Jorge Jr. as the General Manager and 40% shareholder, and Harten as the "unseen" hand running the company, using Peck to solicit "business" for the POIT. NDL believes POIT has continued the fraudulent activities of APS. Many of the same employees who previously worked for APS now work for POIT, including Bedregal, Pozo, and APS's former Secretary, Karol Zavaleta Cardenas, as well as APS's former grain buyers. Further, POIT is working with Peck, according to Harten, who claims to be trying to repay all of the people owed money, including NDL.

84.     For example, Gonzalo recently told Farah during an unexpected meeting in Miami, that he has been paid back 85% of the money he was owned (not disclosing where Harten had gotten the money to repay him). Gonzalo then told Farah that "my damn nephew ripped off another victim in Lima for $300,000 recently." Gonzalo saw no irony that his nephew defrauded someone else, so long as he got paid back his money. Peru is such a lawless country that prior victims of Harten and Peck, like Gonzalo, see no irony, nor have any compunction,

---

Lavalle (Harten's defrauded uncle) and Marysol Emma Salazar Salazar (Harten's wife), but did not include Harten or Peck, to conceal their participation from public review. Once created, Harten and Peck moved all of the APS assets and employees to Mr. Grains.

about taking new victims' money as payment of what they are owed; and then cursing out Harten for being a thief, when it comes to what he stole from them. On June 15, 2015, Farah told NDL that Harten recently stole another $1 million this past year and as recently as August 2015, a former employee of APS provided NDL with an email from a Dutch customer of POIT, claiming that he had been defrauded in 2015 by Harten as well. Harten had previously told NDL in 2014/early 2015 that this Dutch customer had provided him $800,000 to fund Quinoa purchases, the profits from which POIT would use to repay NDL the money it was owed by APS.

85.    It is important to remember that, in addition to Harten and Peck's direct fraud, all of these frauds, including the one perpetrated on NDL, were facilitated by three actions:

     a.  Jorge Sr. changing the APS charter in July 2011 that in turn created the unsupervised Company environment that resulted in Harten then being able to take millions of dollars, including the funds provided to APS by the Plaintiffs, of Company money out in cash allegedly to buy product that he and APS never produced;

     b.  Peck providing Harten and APS (the company that he was the undisclosed majority owner of) facially valid SKE purchase orders that Harten and APS would then shop around to unsuspecting buyers, including Plaintiffs, at meetings that Peck often attended as well; and,

     c.  Creation of POIT by Harten's mother Ofelia, with Harten's brother Jorge, Jr. serving as the General Manager, with them both hiding that Harten himself continues to run the day-to-day operations of POIT with most of the prior APS employees.

86.     Throughout this scheme, Defendants used electronic mail and texts in order to perpetuate the fraud by submitting various fraudulent documents to Plaintiffs.  For example, on or about July 23, 2012, Harten, on behalf of APS and from his APS e-mail address, sent an electronic mail message to both Plaintiff Cook and his wife, Ileana Boza, requesting an additional $130,000.00 for "the balance for the 25 containers" above the monies Harten had already obtained from Plaintiffs.  Harten claimed that "[w]ith 130000 I can buy the difference to start cleaning and have it ready."  At the time that Harten sent this e-mail, he knew this transaction to be fraudulent as had no intent on using this additional money (or even the original funds) to use to purchase any product for Plaintiffs.  Harten knowingly failed to inform NDL of the transaction's fraudulent nature.  Unaware of the fraud, NDL agreed to forward the additional $130,000.00 to Harten.  As a result, Plaintiffs lost even more monies to Defendants' fraudulent scheme.

87.     To execute this aforementioned scheme to defraud, Defendants Harten, Peck, and APS, through APS employee Giuliana Pasquale, knowingly caused a commercial and overnight mail carrier DHL to deliver samples to NDL's customer Western Trading in Pollock Pines, California by sending these samples from Peru.  Defendants intentionally and knowingly transmitted these samples across international and state lines through this commercial and overnight mail carrier.

## V.     Peck and NDL

88.     NDL first met Peck at a lunch organized by Harten in Lima, Peru in May 2012, wherein Peck introduced himself as an employee and officer of SKE Midwestern, which was further evidenced on his business card and SKE's website.  He told NDL that he had worked for a long time with Harten, and APS and Peck was very pleased with the relationship.

29

89.    At the lunch, Peck also stated that APS was one of the top exporters of bean products from Peru, and he confirmed that the purchase order Harten had asked NDL to finance evidencing that SKE had committed to purchase 100 containers or 2,000 metric tons of Black Eye Peas from NDL was "for real," and that APS was awarded the contract to fulfill that order. At that meeting, Peck started selling NDL on the idea of it funding the APS/SKE purchase order to the tune of $530,000 for shipments that were supposed to start in early September 2012.

90.    Further, Peck encouraged NDL to do other business with APS and SKE as well, and said that SKE had many other purchase orders it was filling with APS. Cook later saw these transactions prominently displayed at the entrance to the offices of APS where at least 5-6 SKE purchase orders were on a board.

91.    Peck did not disclose at that meeting, or for months thereafter, that he was in fact the founder and principal owner of APS (at the time of the lunch, Harten was only a 49% owner). Nor did Peck reveal that his employer SKE had previously entered into a series of transactions with APS during the 2010-2011 time frame in which, according to SKE's president Fong, revealed in January 2013, SKE lost $3.6 million.

92.    When NDL was being solicited to provide funding for purported SKE purchase orders, Peck did not disclose to NDL that his boss Fong had told him that Peck's job was on the line if he did not get the return of the $3.6 million that APS owed SKE. NDL only later found all of this out when it met with Fong and Peck in January 2013 in Lima. At that meeting, Fong confirmed that APS and Harten owed SKE $3.6 million, and that none of it had been paid back, and that Peck's job was on the line if he didn't get the money repaid. He also said that SKE was preparing to file a civil and criminal action against APS and Harten in Peru.

93.    It should be noted that almost 2 ½ years later, Peck still works for SKE as a Vice President and is currently listed on their website as such, and SKE never sued APS, Harten, or anyone else in Peru; nor did it file any criminal charges in Peru.  So unless SKE wrote off the entire $3.6 million and moved on, leaving Peck, who had lost the Company $3.6 million, with his job retained, Plaintiffs are informed and believe it is quite likely that SKE has obtained the return of all or a substantial part of its $3.6 million through Peck assisting APS for SKE's and his own benefit, to defraud other purchasers, including the Plaintiffs.  According to Harten in statements he made in 2015 and statements made by Jorge Sr. in 2014, Peck forced Harten to repay SKE with NDL's money.

94.    Plaintiff is informed and believes that over the past 2 ½ years, Peck has continued to attend meetings and lunches with Harten, trying to sell potential victims like Oscar de Osma that they should do business with APS, and its successor in interest POIT (See, Section below).

95.    Peck later disclosed in 2013 to NDL that in order for him to recover the money owed SKE, he and Harten, through APS, would use facially valid SKE purchase orders that SKE had no intention of ever honoring, to seek funds from private lenders and buyer customers of APS, like Plaintiffs, who thought that they were participating in legitimate sales to SKE.

96.    Under the scheme hatched by Peck and Harten, the funds thereby raised by Harten and Peck would then be used by APS to "generate profits" on other sales that Peck would arrange.  The profits generated from those sales would be paid first to SKE to restore its "lost" millions of dollars, and then ultimately be used much later by APS for the benefit of the APS customers, including NDL, which had paid that money for the original stated purposes; in effect turning APS into a Ponzi scheme for the benefit of SKE, Peck, and Harten.

97.     When Fong and Peck were confronted in early 2013 about the SKE purchase orders, they never explained how the SKE purchase orders came to be used by Harten to raise funds.

98.     Fong told NDL that while SKE "was not going out of business over the $3.6 million loss," Peck's job was on the line if he didn't recover the money.  According to Fong and Peck, they were going to join NDL in legal action to recover everyone's money, but that never occurred.  To this date, SKE has taken zero legal action to recover any of its claims, with Fong telling Cook as recently as August 2015 that SKE had "written off the loss completely."

99.     As of June 2015, Peck still has his job and continues to meet with and pitch customers with Harten.  Harten recently insisted to NDL in Lima that at least $1 million of NDL's money was used by him and Peck to pay SKE.  In July 2013, an employee of APS disclosed to NDL that Harten and APS paid for an apartment for Peck in Lima, Peru until April 2013; money for which could only have come from the money stolen from NDL and other victims of Peck and Harten.

## VI.     The Role of Harten's Family in Covering-Up the APS Fraud

100.    In trying to sell APS as a trustworthy source of product, first Farah, and then Harten, stressed to NDL that it had nothing to worry about because Harten was an honest and well-connected buyer.  Even Peck stressed at the initial meeting that NDL's money would be "absolutely safe," since Harten had personal protection from his brother-in-law General Salazar, Chief of the Peru National Police (whenever NDL met with Harten, he was always accompanied by a bodyguard provided to him, according to Harten, by General Salazar from the Peruvian National Police).  Harten added, and Farah and Peck confirmed, that APS "knew the right

people" and therefore could get the best prices and deliver everything on time; but that product had to be bought in cash because the farmers only dealt in cash.

101.    NDL then embarked on a series of due diligence reviews of APS, Harten, and Peck between April and June 2012.  Everything NDL saw from the publicly available information indicated that what it was hearing from Harten and Peck was true.  The credit checks and bank reports on APS all came back clean.

102.    Hearing the same things from Harten's immediate and extended families was very important to NDL, given the family's prominence.  In meeting and speaking with them (Jorge Sr., Javier Rodriguez Larrain Salinas and Roque Benavides), NDL never heard anything negative about APS, Harten, Peck, or SKE; particularly when it came to Harten's family, especially his father Jorge, Sr.

103.    For example, at NDL's first meeting with Harten in Bujama, Peru, in April 2012, Harten's wife Marysol, along with his Uncle Javier, and Javier's wife Gisele Said, strongly recommended NDL do business with Harten, and assured NDL that Harten was a "responsible, honest, and very successful businessman."

104.    What Javier Rodriguez Larrain Salinas and his wife didn't tell NDL, was that at the time of that meeting in Bujama, Harten had failed to repay Javier close to $500,000 and another Rodriguez Larrain relative Gonzalo an additional $100,000 that Harten had induced them to give to APS to buy agricultural products that Harten never procured.

105.    Gonzalo Rodriguez Larrain de Lavalle, another of Harten's uncle, later tried in 2013 to attempt to induce his close friend Oscar de Osma, at a meeting attended by Harten and Peck, to give APS $2 million to fund projects.  Gonzalo did not, however, disclose to de Osma that APS and Harten owed him and his uncle Javier Rodriguez Larrain Salinas $600,000

collectively; much less that NDL had also been defrauded of almost $1.6 million by Harten and APS (at the time of the meeting Peck was still operating under the orders of his boss Fong to get SKE its money back or lose his job)  According to Farah,[9] Harten's uncle, Emilio Rodriguez Larrain, had, on an occasion prior to Harten's introduction to Plaintiffs, recommended Harten and his company to Farah, never telling Farah of Harten's troubled past as a drug user and compulsive gambler.  Harten was committed for a time to a rehabilitation facility in Peru. According to Farah, this information was well known to Emilio Rodriguez Larrain, who had forbad his own troubled son from doing business with Harten and APS in 2011 or prior to Farah's introduction to Harten at the beginning of 2012.

106.    Further, when NDL met with Jorge Sr. at a Peruvian soccer match in mid-2012 after the Bujama introduction to his son, Jorge Sr. said his son was an honest and successful businessman, never disclosing his son's prior drug and gambling problems.  Moreover, Jorge, Sr. failed to disclose the fact that Harten and APS had a longstanding business dispute with SKE, all of which Jorge Sr. was well aware of at that time given his role as an Apoderado of APS.

107.    NDL likewise had a meeting with Harten's uncle Roque Benavides, one of the wealthiest businessmen in Peru, and he also never said a negative word about Harten.

108.    As NDL has experienced, there is a disturbing pattern when it comes to what the Harten and Rodriguez Larrain and their extended families state favorable things about Harten when new players are thinking of entering into business with him.  Later, however, they change their story when the business deals go sour after large amounts of funds provided to Harten and APS are unaccounted for and promised product has never been delivered.

---

[9]     Farah knew about the approach to de Osma and was angry with NDL for warning de Osma about its concerns about doing business with Harten.

109.    In those first meetings with Harten's various family members, everything is presented as being completely safe from a business perspective.  No disclosures about Harten's past troubles or problems (personal or business) are made; but once the activities of Harten and his company APS become of concern to NDL or any of their other victims, all of his family members tripped over themselves saying they either never trusted him, or that his victims, including NDL, were foolish to ever do business with him.  And without a shred of shame or irony, these later comments were the exact opposite of what they had previously said about Harten to NDL and Harten's other victims.

110.    A good example of which was at a meeting NDL had with Jorge Sr. in early 2013 that was arranged by Benavides.  Jorge Sr. first argued that NDL was foolish to do business with his son; then added that Peck was the crook, not his son; and then that SKE forced Harten to make bad business decisions, and that it was SKE who owed Harten money and not the other way around; and then concluded by saying, "but I am not responsible for this problem."

111.    Likewise, when NDL met with Benavides in early 2013 to express its growing concerns about Harten, his reaction before the words were even out on the table were that, "I was afraid this is what you were coming to see me about; I never liked that guy, nor understood where he got the money for fancy cars or new apartments, but I am not responsible for this problem," as if NDL's earlier conversation with him in July 2012 had never occurred.

112.    Emilio Rodriguez Larrain (who had encouraged Farah to do business with Harten) allegedly told his own son never to do business with Harten; but never told Farah about his own reservations.  And when the fraud of Harten was finally revealed in 2013 and 2014, his only response to Farah was "I am not responsible for this problem."

113.    Also of note is that the family law firm, Estudio Rodriguez Larrain was the site of several meetings wherein Jorge Sr., Emilio Rodriguez Larrain, and Javier Rodriguez Larrain Salinas (all partners and owners of the law Firm), stressed that they were not the lawyers of Harten and APS.  Nonetheless, at those meetings, each of them stressed that Harten had purchased the product, that APS had it in its possession, and would be supplying it to Farah and NDL (the same thing Harten had stated in his sworn responses to Notary Letters sent by NDL to APS, Harten, Jorge Sr., Jorge Jr., and Peck as the Apoderados).

114.    All of those statements were false; the product then owed by APS to NDL, Farah, and others dealing with APS was either never purchased by Harten and APS; or was purchased, sold to other parties, and neither the product nor the profits derived from the sale thereof were ever delivered to NDL, and was instead converted through sale to unknown third parties solely for the benefit of Harten and Peck and NDL believes, to Gonzalo and Javier, Urteaga, Farah, and others to whom Harten and APS owed money, including SKE.

**VII.    How Was APS Able to Steal Millions?**

115.    As stated above, the signal change in the way APS operated after the SKE loss of $3.6 million, was when Jorge Sr. removed himself and Peck in 2011 as a required co-signatories of the APS bank accounts.  This allowed Harten to be able to remove, by himself, millions of dollars of customer and lender funds in cash from several different Peruvian banks in which Harten had opened APS accounts with zero oversight.  Under Peruvian law, this charter change would also require the consent of Peck, as majority owner of APS.

116.    Once Jorge Sr. had made the charter change, Harten simply then took cash from those accounts and, *inter alia*, put some of those amounts into the account of an APS employee named Nilton Palacios Pozo (whom, according to Farah, Jorge Sr. apparently had hired to

oversee his son conduct to make sure he didn't return to using drugs or gambling).  The location of the balance of the funds, in the millions of U.S. dollars, remains unknown.  Typically, Harten would invite a customer to wire the funds to one of APS' Peruvian bank accounts, and then within a day or two would start withdrawing the funds in cash from those accounts.  Amounts of the withdrawals would vary, but almost all of them were in excess of $10,000 per transaction, at least as it applied to the funds NDL sent to APS.

117.    Jorge Sr. knew exactly what kind of bad actor his son was; but he nonetheless acted recklessly to free his son to go on an extensive wave of criminal activity, to permit his son to steal millions of dollars, allegedly to repay SKE and then other earlier Ponzi scheme victims, including his brother-in-law Javier and his relative Gonzalo, to whom Harten owed money.

118.    At that time, Harten owed SKE $3.6 million, Javier Urteaga $2 million, and several million U.S. dollars more to Farah, Javier, Gonzalo, and others prior to NDL's entry onto the APS scene.

119.    In 2013, NDL was told by one of the employees of APS and by Peck that one of those earlier victims, Urteaga, had threatened Harten and Peck with physical injury if he were not repaid; confronting Harten and Peck in the APS offices with a gun and later smashed in the windshield of Harten's car.  Peck told NDL that he was terrified to go to the APS offices after those events, and had to keep the address of his Lima residence a secret because he was afraid he would be injured or even killed by people whom APS owed money to; a company he in turn owned.

120.    Jorge Sr. also acted to try to shield himself and his son Jorge Jr. from any liability for the criminal acts of Harten by claiming to defrauded customers like NDL and Farah that they would have prevented the fraud by Harten, but unfortunately they had "no authority" under the

Company's charter to oversee or control Harten's criminal activity,  This assertion conveniently ignores that the only reason they had no authority over Harten was because Jorge Sr. had already earlier changed the Company's charter to drop the oversight authority and accountability that he and the other Apoderados' previously possessed (presumably in order to protect APS's customers from the inappropriate activities in which he knew that Harten had previously engaged).  Peck likewise has claimed repeatedly that he had no way of knowing what was going on in APS because Harten and Bedregal, the APS internal accountant, refused to give him any information; conveniently ignoring his status as both the majority owner of APS and as one of its Apoderados.

## VIII.  Defendants' Use of the Peruvian Banks

121.    As stated above, NDL checked on the credit status of APS and everything reported fine.  The report said APS was not in default on any of its accounts, and its credit rating was acceptable, with active credit lines from 2 major Peruvian banks.

122.    NDL now believes that Harten was laundering millions of dollars through the Peruvian banks, much of it from foreign sources, in large cash transactions in the tens of thousands of dollars.  NDL likewise believes that those banks either may have failed to report anything suspicious to UIF, the Peruvian Fiscal Investigation Unit, or to SUNAT, the domestic tax authority of Peru, about those cash withdrawals or perhaps they or their employees were complicit in the money laundering activities of Harten and APS.

123.    Peruvian law clearly requires Peruvian banks to have Know Your Customer (KYC), Suspicious Transaction Reporting (STR), and Cash Transaction Reporting (CTR) systems in place; yet it appears none of those came into play when it comes to APS and Harten. Harten, and APS, a Company owned by Peck, took millions of dollars from the APS accounts, in

clear daylight and with no apparent objections from the Peruvian banks. The banks had to know that APS produced little or no product for its customers, because no funds from the sale of product by APS ever went into the Company's accounts as a consequence of millions of foreign-originated and domestic funds having come into those accounts from APS customers.

124.    If APS never made any sales, then its accounts were one-way mediums for foreign and domestic customer money to come into Peru, be taken out in cash, with the ultimate destination unknown, an example of classic money laundering.

125.    Likewise, under Know Your Client rules and Peruvian law, it was incumbent upon those banks to know certain information about APS, a company importing U.S. dollars and then taking them out in dozens of cash transactions, for no apparent legitimate business purpose.

126.    Because of the failure of the Peruvian banks to adhere to their obligations under Peruvian law, Harten and Peck were instead able to convert those millions of dollars for their own personal use – all in cash transactions, about which the Peruvian banks may have reported nothing to UIF or SUNAT.[10]

127.    NDL believes the Peruvian banks and their employees facilitated these criminal acts by never questioning why a domestic company that was exporting little or no product was importing millions of dollars of cash from the U.S. and elsewhere.

## IX.    APS has Refused to Provide a Full & Complete Accounting

128.    Over the past two years, NDL has also been trying to get a full and complete accounting of where its money went; given the small amount of product actually produced by

---

[10]    As far as NDL knows, neither Harten nor Peck ever declared any of the NDL funds which they converted for their personal use or in Peck's case for the use of his employer SKE, as income to either SUNAT or the IRS (and if SKE received those funds, which they had to know were the result of criminal activity by Harten and their employee Peck, never reported it as income either) so as to avoid paying taxes in their respective countries.

APS, Harten, and Peck.

129.    Numerous requests to APS to provide NDL invoices and appropriate supporting documentation for the purchases allegedly made by APS on behalf of NDL have been made in writing and verbally to: Harten as the General Manager; Felipe Bedregal, the in-house accountant; Manuel Vidaurre, the in-house legal counsel, Sam Peck as the majority owner of APS; and to Jorge Harten Sr. and Jorge Harten, Jr., the Apoderados (done via emails and formal Notarial Letters).

130.    All NDL requests for evidence that the product was actually bought have been in vain. Nothing has been provided about the vast majority of funds paid by NDL to APS for the purchases outlined above.

131.    When NDL asked Bedregal to provide evidence that NDL's money was spent buying the agreed upon product, he said he had no receipts and could not tell NDL where the money went, beyond the fact that he knew personally that Harten took large amounts of cash from the accounts of the Company, including NDL's money.

132.    Bedregal claimed in 2013 that he could not properly close APS' books for the year 2012 and beyond, because he had no information from Harten about where Harten spent the money he took from APS in cash and that NDL "must talk to Nacho [Harten]" if it wanted any data. Bedregal refused to disclose anything further unless compelled by the Courts.

133.    NDL has repeatedly asked Harten to deliver the evidence of what he did with its money, but Harten has not responded to these requests, always refusing to answer the phone or provide information. The same result came from requests for such information from Peck, Jorge Sr., and Jorge, Jr. notwithstanding their legal roles as Apoderados; and in the case of Peck, also being the majority shareholder of APS.

134.    Peck claimed that he did not have any of the information, nor would Harten or Bedregal provide it to him, despite the fact that he was the majority shareholder of APS and under Peruvian law had an absolute right to be provided access to the information.  NDL has numerous emails with Peck wherein he claims to be helping NDL to get its product delivered, when he knew that no such product had ever been bought.

135.    The few invoices that were provided by APS as evidence of the small amount of what was actually purchased and shipped, were clearly fraudulent, and simply produced by APS to keep SUNAT off the scent of where the millions of other dollars sent to APS actually went. These invoices did not reflect the prices Harten agreed to charge in signed purchase orders or when he claimed to have bought the product.

## X.    The Fraud Continues – Peruvian Organic International Trading (POIT)

136.    NDL was informed by an APS employee that a series of meetings were held at Estudio Rodriguez Larrain's offices and at Javier Rodriguez Larrain Salinas's house in 2013 and early 2014 between the Harten and Rodriguez Larrain families to discuss the new company to be formed with Harten running the business "from the shadows."  At that meeting, they also disclosed that Javier and Gonzalo were trying to get money to fund the new company from Oscar de Osma.

137.    Harten then met with APS's employees to brief them on the new plan.  APS owed salary and was seriously in arrears, but Harten wanted to keep as many of the employees as possible.  Harten told them that Harten was starting a new business with his uncle Javier Rodrigues Larrain and others, in which the participation of Harten would be hidden from the public.

138.     Under this plan, APS would still keep some small export contracts, but basically would be inactive; and Harten would move most of the APS assets, including its employees, to the new company. This, in fact, later happened. Harten told the employees that the new company, to be called Mr. Grains & Cereals Products, SAC would have $5 million in funds available, and would not have trouble paying their salaries.[11]

139.     During the meeting, some of the employees wanted to know what Harten had done with the millions of dollars APS had been paid from customers, and which were received into the accounts of APS from NDL, SKE, Farah, and other customers and financiers. When the employees pushed Harten on where the money went, fearing their own liability, he told them that he had to go to a meeting, and left without answering any of their questions.

140.     Following that employee meeting, meetings between NDL and Farah on the one hand, and Harten, APS, Peck, Jorge Sr., and Jorge Jr., and attended by others in the Rodriguez Larrain family, including Emilio and Javier, were held at Estudio Rodriguez Larrain. At these meetings, repeated statements were made by Harten's family members that the product had been bought by Harten and would be delivered "shortly."

141.     NDL, based on those representations, then secured a local exporter Sierra y Selva, S.A. to buy all of NDL's quinoa (organic and conventional) to be delivered by APS according to those representations. By December 2012 or January 2013 and beyond into March 2013, APS and Harten stalled providing NDL the actual product; ultimately never producing any of the product. Had it done so, NDL would have been able to recover a considerable amount of the funds lost to APS, Harten, and Peck.

---

[11]     When de Osma later learned of NDL's concerns about Harten, Peck and APS, he closed the new Company, kicked Harten, Peck and APS out of its space, and Harten was forced subsequently to start another fraudulent company with his mother and brother called Peru Organic International Trading, SAC ("POIT").

**Summary**

142.     Instead of providing credible and true information to NDL, Harten (in the form of responses to Notary Letters) and Peck, Jorge Sr., and Jorge Jr. (in the form of emails and verbal communications), along with other members of Harten's family and several of APS's employees, all continued to claim the product NDL and others had purchased from APS, and for which they paid APS millions of dollars, was actually bought and would be delivered at some point soon after those representations were made by each of them.  To date, other than the 64 metric tons outlined above, none of the remaining promised product has ever been produced to NDL or its customers.  It was only in the middle of 2014, after being confronted with evidence they could not refute, that Harten and Jorge Sr. finally admitted to NDL that the funds of NDL and other customers had been stolen and used by Harten, Peck, and APS, in part, to pay off other creditors of APS, including members of Harten's family and SKE.

143.     As recently as late 2014, Harten and Jorge Sr., in a meeting with NDL, claimed that Peck and SKE received most of NDL's money to compensate themselves for the money Harten stole from them originally.  Harten asserted the same again in a meeting with NDL in early 2015.

144.     Harten, his mother Ofelia, and Jorge Jr., with the advice of his father Jorge Sr., in 2014 created the new company POIT (with most APS employees, including Bedregal) that sold more than $1 million in exports in 2014. It is likely that at least some of these sales were made using funds procured from NDL in 2012 and any profits therefrom were used solely to benefit Harten, Peck, and other Defendants.

145.     Acknowledging their obligation verbally and through a course of conduct to NDL for the first time in late 2014, Harten and Jorge Sr. verbally promised to pay NDL $1.7 million

plus 8% interest, over time through the operation of POIT.  In fact, since December 2012 until the present, Harten through POIT has only paid NDL a total of $48,540.

## FEDERAL LAW VIOLATIONS

A.  **Racketeer Influenced and Corrupt Organizations Act**

a.  Racketeering Enterprise

146.  An "enterprise" is "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

147.  In the present case, and at all relevant times to this Complaint, the Enterprise fell within the meaning of 18 United States Code § 1961(4) and it consisted of persons and entities described under this section.

148.  The Enterprise, which was an ongoing association-in-fact, consisted of both culpable and non-culpable members.

149.  The culpable members, also known as the Defendants, actively participated in and facilitated the Enterprise itself.  In the present case, the Enterprise's culpable members engaged in (1) mail fraud; (2) wire fraud; and (3) money laundering.

150.  At all times relevant to this Complaint, the Enterprise operated in the District of Columbia, North Dakota, Peru, and elsewhere, and its activities affected interstate and international commerce.

b.  Purpose of the Enterprise

151.  At all times relevant to this Complaint, the Enterprise's objective was to generate profits and enrich Harten and various of his conspirators and preserve their ill-gotten gains by engaging in both legitimate and illegitimate activities.  These activities involved the inducing of

Plaintiffs and others to provide monies based upon fraudulent promises and attempts to cover up these frauds.  At the relevant times, Plaintiffs were resident in the District of Columbia.

152.    At all times relevant to this Complaint, the Enterprise's legitimate activities involved the export of agricultural goods from Peru and the purchase of such goods by others who exported them to other countries, including the United States.

153.    At all times relevant to this Complaint, the Enterprise's illegitimate activities involved using various export and import companies and their employees to promote the façade of legitimacy:

  a.  Enriching Harten and his family and Peck by fraudulently inducing Plaintiffs and others to provide capital for the purchase of agricultural goods that were never acquired;

  b.  Recruiting and controlling individuals in every position key to its fraudulent agricultural goods import business, thereby limiting the Enterprise members' exposure to criminal liability and maximizing their financial gain.  The controlled individuals and entities included officers and directors of export and import companies in Peru and the United States, employees of those companies, and other alleged and actual purchasers;

  c.  Penetrating the agricultural goods import market generating profits at all costs by employing illegal means.  To generate the largest possible profit for themselves, Harten and the other individual Defendants commandeered APS and SKE, and used them to effectuate their illegal import/export business; and,

  d.  Preserving these ill-gotten gains by covering up their fraud and falsifying various excuses for their alleged inability to perform when they never had any intent to

perform on any of the deals in which they lured Plaintiffs and other victims of their schemes to defraud.

c.    Membership of the Enterprise

154.    The following persons and entities were the Enterprise's culpable and non-culpable members:

    a.    Ignacio Harten Rodriguez Larrain;

    b.    Agricola Peruana Del Sol, S.R.L.;

    c.    Samuel Peck;

    d.    Emilio Farah;

    e.    Convalor S.A.C. and Confactor S.A.C.;

    f.    SKE Midwestern, Inc.;

    g.    Giuliana Pasquale;

    h.    C&V Exports, S.A.C.;

    i.    Cesar Valdivia;

    j.    Jorge Harten Costa, Sr.;

    k.    Jorge Harten Rodriguez Larrain, Jr.;

    l.    Ofelia Rodriguez Larrain Salina de Harten;

    m.    Marysol Salazar Salazar de Harten;

    n.    Antonio Salazar Salazar;

    o.    Javier Rodriguez Larrain Salinas;

    p.    Gonzalo Rodriguez Larrain de Lavalle;

    q.    Javier Urteaga;

    r.    Collinsville Corp. Sucursal Del Peru;

s.      Manuel Vidaurre;

t.      Felipe Tadeo Bedregal Vargas;

u.      Nilton Palacios Pozo;

v.      Agricola Peruana Del Sol, S.R.L.'s employees, including but not limited to, Karol Zavaleta Cardenas;

w.      SKE Midwestern, Inc.'s employees, including but not limited to, Wesley Fong;

x.      C&V Exports, S.A.C.'s employees, including but not limited to, Cesar Valdivia;

y.      Pride Marketing;

z.      Peruvian banks such as Banco de Crédito del Peru and BBVA Continental;

aa.     Customers of NDL such as Western Trading and Southwest Agra; and

bb.     Potential and actual purchasers in the various deals to import agricultural goods by APS, including but not limited to, SCI Corporation, Chad Nickles, and Alex von Ehren.

cc.     Potential additional financial partners for APS and/or its successor company, such as Oscar de Osma.

d.      <u>Structure of the Enterprise</u>

155.    At all times relevant to this Complaint, the Enterprise's structure was a complex organization with many members and players. Specifically, the Enterprise had the following actors:

a.     *Peck and Harten*

156.    Samuel Peck and Ignacio Harten Rodriguez Larrain were the masterminds behind the entire Enterprise. They concocted the scheme to defraud purchasers who were interested in exporting agricultural goods from Peru, and accordingly, generate profit for themselves and Harten's family. Peck and Harten controlled the Enterprise and made the decisions relating to the Enterprise's actions and reaped the vast majority of the Enterprise's ill-gotten profits.

b.     *APS and its Employees; Other Export/Import Companies*

157.    Using APS, Harten and other Enterprise members entered into agreements with export and import companies and purchasers to finance the export of agricultural goods from Peru to other countries including the United States. These companies were located throughout the United States and Peru and included SKE, C&V Exports, Pasquale & Associates Trading Company, Pride Marketing, Convalor/Confactor (through Farah), Collinsville Corp. (through Urteaga), and SCI Corporation. As part of their agreement, Harten and other Enterprise members solicited purchasers to finance the exportation of agricultural goods from Peru. Harten and other Enterprise members communicated interstate with prospective purchasers using telephones, facsimile machines, computers, and emails. The United States Postal Service, United Parcel Service, Federal Express, DHL, and other commercial mail carrier services were also employed to transport documents and samples internationally to many of NDL's customers to assure them about the "legitimacy" of these sham transactions. APS employees such as Manuel Vidaurre, Felipe Bedregal, Nilton Palacios Pozo, Antonio Salazar Salazar, and Giuliana Pasquale were instrumental to convincing Plaintiffs and other defrauded parties regarding the perception of legitimacy to APS. Several of the other exporters, including SKE, C&V Exporters,

and Convalor/Confactor joined the scheme by assisting in the frauds or knowingly accepting

proceeds from the fraudulent activities of the scheme.

      c.    *SKE Midwestern, Inc.*

158.    NDL first met Peck, the V.P. of SKE at a lunch organized by Harten in Lima,

Peru in May 2012, wherein Peck introduced himself as an employee and officer of SKE

Midwestern (as evidenced on his business card and SKE's website).  Throughout the scheme,

Peck, encouraged Plaintiffs to continue to invest with APS and Harten, and vouched for their

legitimacy, despite the fact that Peck knew that Harten had already defrauded SKE.  Peck hoped

that by assisting Harten to defraud others, they would be able to obtain the return of the funds

that SKE had lost to Harten's frauds on SKE.  Moreover, Peck never disclosed to Plaintiffs that

he was the majority owner of APS.  These actions were done in the context of the employment of

Peck by SKE and were done on SKE's behalf.  Peck remains an officer of and still works for

SKE, and SKE has never sued APS nor Harten for the fraud perpetrated on SKE.  Plaintiff

believes, based on the representations by Harten and Jorge Sr. that Plaintiffs' money was paid by

Harten and APS to Peck for the benefit of SKE, that it is likely that SKE has chosen not to sue

Harten and APS because it has recovered all or part of its losses by virtue of its employee and

officer Peck's assistance in the conspiracy with Harten to defraud others and/or redirection of

funds that belonged to others, as evidence by the fact that Peck and SKE are continuing to work

with Harten in order to recoup their earlier losses.

      d.    *Emilio Farah, Jorge Harten, Sr., Jorge Harten, Jr., Ofelia Maria*
             *Rodriguez Larrain Salinas de Harten, Javier Rodriguez Larrain Salinas,*
             *and Gonzalo Rodriguez Larrain de Lavalle*

159.    As described above, Farah was the person who introduced Plaintiffs to Harten and

thus, APS and Peck.  Harten recruited various persons including his father, Jorge, Sr.; his

brother, Jorge Jr.; and other relatives, Ofelia Maria Rodriguez Larrain Salinas de Harten, Javier Rodriguez Larrain Salinas, and Gonzalo Rodriguez Larrain de Lavelle, to assist him with the schemes to defraud Plaintiffs and other potential victims and to vouch for APS's legitimacy so that victims of these frauds would be more willing to invest their funds with Harten and APS.

160.    On several occasions, Plaintiffs and other defrauded parties reached out to these Defendants in order to assure themselves that Harten was legitimately purchasing the agricultural goods for which he had been paid.  Harten Sr. and Harten Jr. each vouched that such purchases had taken place even though they knew or should have known that Harten had not made such purchases.

    e.  *APS's Involvement in the Enterprise*

161.    Defendants Harten, Peck, Jorge Sr., and Jorge Jr. formed APS with appropriate protections to ensure that Harten, whom Peck, Jorge Sr., and Jorge Jr. knew to have a propensity to be dishonest, could not use APS to defraud purchasers.  Even assuming that APS's original purpose was to provide legitimate brokerage services to purchasers of Peruvian agricultural goods; Harten, with Peck's assistance and complicity, later hijacked APS to facilitate their fraud scheme and to directly participate in the Enterprise.  Peck, Jorge Sr., and Jorge, Jr. later withdrew these protections and effectively provided Harten with carte blanch to defraud potential purchasers.  These Enterprise members knew when Harten and APS were participating in sham transactions, but nonetheless provided Harten and APS with an air of propriety so that he could continue his schemes to defraud purchasers.  Once Harten was turned loose on unsuspecting purchasers by the other APS owners, he made just enough legitimate purchases in order to throw suspicious purchasers off the scent of his fraud.

f.    *SKE's Involvement in the Enterprise*

162.    Prior to Farah's introduction of Plaintiffs to Harten in 2011, SKE had been defrauded by Harten and APS.  As explained above, SKE was one of the early victims of Harten's fraud schemes and then joined with Harten in order to recoup its losses.

163.    SKE directly participated in the conduct of the Enterprise because its key employee and officer Peck was involved in procuring new victim purchasers for Harten's fraudulent schemes and in providing fraudulent SKE purchase orders to entice the Plaintiffs and other victims to fund APS and buy product through it.  These schemes generated profits for the Enterprise's culpable members, including SKE, while leaving the victim purchasers with sizeable losses.

g.    *The Victims*

164.    At all times relevant to this Complaint, there were two categories of purchasers. The first category were purchasers who were defrauded and then joined into the Enterprise in order to recoup their losses.  These included SKE, Farah, Javier Rodriguez Larrain Salinas, and Gonzalo Rodriguez Larrain de Lavalle.  Other purchasers, such as NDL, were tricked by Enterprise members into believing that Harten was a legitimate businessman based upon their testimonials to his honesty and his past performance of "successful" transactions.

165.    Regardless of the type of purchaser, the falsified documents and testimonials directly resulted in widespread losses to the victim purchasers, and caused millions of dollars in damages to these purchasers across the world.

e.    Distinction Between the Enterprise and the Pattern of Racketeering

166.    As described herein, the Enterprise was separate and apart from the pattern of racketeering activity because it engaged in both legitimate and illegitimate activity.

f.      Continuity of the Enterprise

167.    The Enterprise was created prior to 2011 and continues to date.  Due to the word getting out regarding the fraud committed by Harten and APS, APS was closed or "no habido" according to Peruvian government records and the Enterprise's activities were converted to an alternate vehicle named POIT, where Harten's participation was and remains concealed from past, current and future victims; however, the Enterprise continues to engage in illegal acts and will do so indefinitely into the future, unless ended by this litigation.

g.      Culpability of the Enterprise's Members

168.    Some members acted with culpability throughout the Enterprise's existence. Other members were the unwitting instruments of the Enterprise's culpable members.

B.      Pattern of the Specific Racketeering Acts (Predicate Acts)

169.    A pattern of racketeering is two or more predicate acts of racketeering activity committed in a ten-year period that amount to, or pose a threat of, continued criminal activity. 18 U.S.C. § 1961(5), *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 US 229, 239, 109 S. Ct. 2893, 2893 (1985).

170.    In the present case, Defendants engaged in (1) mail fraud; (2) wire fraud; and (3) money laundering, and these actions directly and proximately injured NDL.  Moreover, these predicate acts were committed during the past five years and may continue indefinitely into the future unless this litigation has the effect of preventing such conduct and stopping Defendants.

**MAIL FRAUD**
**18 U.S.C. § 1341**

171.    Plaintiffs hereby incorporate into this paragraph all other factual allegations in this Complaint as though fully set forth herein.

52

172.    18 United States Code § 1341 is violated when a person or entity devises a scheme to either defraud or obtain money or property by means of fraudulent pretenses or representations using interstate or intrastate mail.

173.    In the present case, the following Defendants violated 18 United States Code § 1341.

174.    On or about September 24, 2012, Guiliana Pasquale of APS intentionally caused samples of product sought by customers of NDL to be mailed by DHL to Western Trading in Pollock Pines, California from Lima, Peru. Pasquale fraudulently purported these samples to be the proposed product that would be shipped to Western Trading if it made an order through Plaintiffs. This mailing was done at the behest of Harten and in furtherance of the scheme to defraud Plaintiffs.

## WIRE FRAUD
### 18 U.S.C. § 1343

175.    Plaintiffs hereby incorporate into this paragraph all other factual allegations in this Complaint as though fully set forth herein.

176.    18 United States Code § 1343 is violated when a person or entity, having devised or intended to devise any scheme to either defraud or obtain property by fraudulent pretenses, transmits, or causes to transmit, any wire communication in interstate commerce for the purpose of furthering the scheme to defraud.

177.    In the present case, the following named Defendants violated 18 United States Code § 1343.

178.    On October 11, 2012, Karol Zavaleta Cardenas of APS intentionally caused a photograph of sample beans to be transmitted by electronic mail to Plaintiff Cook in Washington, D.C. from Lima, Peru.  This transmission was done at the behest of Harten and in

furtherance of the scheme to defraud Plaintiffs.

179.   Similarly, on July 9, 2012, Harten, on behalf of APS, intentionally caused a message to be transmitted by electronic mail to Plaintiff Cook and his wife, Ileana Boza, in Washington, D.C. from Peru.  The electronic mail message confirmed that Harten had received $120,000 for the SCI contract and that "[t]wo containers are leaving this week" by vessel and "the other four will go next week."  Harten knew that these representations were false and that he did not have even 2 container of product, much less six.  This transmission was done in furtherance of the scheme to defraud Plaintiffs.

180.   On July 12, 2012, Harten intentionally caused a photograph to be transmitted by electronic mail to Plaintiff Cook and his wife, Ileana Boza, in Washington, D.C. from Peru.  The photograph purported to be that of the quinoa that had been purchased for SCI.  Harten knew that this was false as he had not purchased any quinoa for SCI.  This transmission was done in furtherance of the scheme to defraud Plaintiffs.

181.   Similarly, on or about July 23, 2012, Harten, on behalf of APS and from his APS e-mail address, sent an electronic mail message to both Plaintiff Cook and his wife, Ileana Boza, requesting an additional $130,000.00 for "the balance for the 25 containers" above the monies Harten had already obtained from Plaintiffs.  Harten claimed that "[w]ith 130000 I can buy the difference to start cleaning and have it ready."  At the time that Harten sent this e-mail, he knew this transaction to be fraudulent as had no intent on using this additional money (or even the original funds) to use to purchase any product for Plaintiffs.  Harten knowingly failed to inform NDL of the transaction's fraudulent nature.  Unaware of the fraud, NDL agreed to forward the additional $130,000.00 to Harten.  As a result, Plaintiffs lost even more monies to Defendants' fraudulent scheme.

## MONEY LAUNDERING
### 18 U.S.C. § 1956

182.    Plaintiffs hereby incorporate into this paragraph all other factual allegations in this Complaint as though fully set forth herein.

183.    18 United States Code § 1956 is violated when a person or entity, using proceeds generated from an unlawful activity, conducts a financial transaction with the intent to carry on of the unlawful activity and conceal the nature, source, ownership, or control of the unlawful proceeds.

184.    In the present case, the following Defendants violated 18 United States Code § 1956.

185.    Between 2012 and the present date, in and around Lima, Peru,, Defendant Harten knowingly conducted financial transactions affecting international and interstate commerce using proceeds generated from unlawful activity.  Harten conducted these financial transactions to in whole, or in part, conceal the nature, location, source, ownership and/or control of the money generated from the unlawful activity in violation of 18 United States Code § 1956.

186.    Specifically, Harten and APS were involved in unlawful transactions financed with fraudulently-generated funds with Banco Credito de Peru and BBVA Continental.  Further, these transactions were, in themselves, unlawful, and accordingly, generated more illegal money for Harten and APS to launder, because they violated federal statutes including mail fraud and wire fraud.

187.    Between 2012 and the present date, in and around Lima, Peru, Defendant Harten knowingly conducted financial transactions affecting international and interstate commerce using proceeds generated from unlawful and fraudulent activity.  Harten conducted these financial

transactions to in whole, or in part, conceal the nature, location, source, ownership and/or control

of the money generated from the unlawful activity in violation of 18 United States Code § 1956.

### COUNT I: VIOLATION OF 18 UNITED STATES CODE SECTION 1962(c)

188.    Plaintiffs hereby incorporate into this paragraph all other factual allegations in

this Complaint as though fully set forth herein.

189.    Plaintiff is a "person" within the meaning of 18 United States Code §§ 1961(3)

and 1964(c).

190.    Each Defendant is a "person" within the meaning of 18 United States Code §§

1963(3) and 1962(c).

191.    The Enterprise constituted an "enterprise" within the meaning of 18 United States

Code §§ 1961(4) and 1962(c), and at all times relevant to this Complaint, was engaged in

legitimate and illegitimate activities affecting interstate commerce.

Between May 2012 and the present date, in the District of Columbia, Peru, North Dakota, and

elsewhere in the United States, Defendants Harten, Peck, Farah, Marysol, Pasquale, Vidaurre,

Bedregal, Pozo, Salazar, Urteaga, Javier, Gonzalo, Ofelia, Jorge Sr., and Jorge Jr, as well as

APS, SKE, Convalor/Confactor, and C&V Exports were all associated with the Enterprise and

knowingly and intentionally combined, conspired, and agreed to violate 18 United States Code §

1962(c).  Otherwise stated, the named Defendants participated, both directly and indirectly, in

conducting the Enterprise's affairs through a pattern of racketeering activity.  This pattern of

racketeering activity consisted of multiple acts, previously described in-depth and herein

incorporated by reference, indictable under:

   a.    18 U.S.C. § 1341: Mail Fraud.  Several instances of mail fraud in

       violation of 18 United States Code § 1341 by executing, and attempting to execute, a

scheme to defraud and to obtain money and property by means of false pretenses and misrepresentations, using the mails to satisfy U.S. customers of NDL.

      b.     <u>18 U.S.C. § 1343: Wire Fraud</u>.  Multiple, repeated, and continuous instances of wire fraud in violation of 18 United States Code § 1343 by executing, and attempting to execute, a scheme to defraud and to obtain money and property by means of false pretenses and misrepresentations, using interstate wire communications.

      c.     <u>18 U.S.C. § 1956: Money Laundering</u>.  Multiple, repeated, and continuous instances of money laundering in violation of 18 United States Code §1956 by knowingly using proceeds generated from an unlawful activity, conducts a financial transaction with the intent to carry on of the unlawful activity and conceal the nature, source, ownership, or control of the unlawful proceeds.

192.    As a direct and proximate result of Defendants' above-named racketeering activity, NDL's suffered irreparable damage, incurring severe monetary losses and lost business opportunities.

193.    Specifically, Defendants Harten, Peck, Farah, Marysol, Pasquale, Vidaurre, Bedregal, Pozo, Salazar, Urteaga, Javier, Gonzalo, Ofelia, Jorge Sr., and Jorge Jr, as well as APS, SKE, Convalor/Confactor, and C&V Exports' violation of 18 United States Code § 1962(c) caused approximately $2,011,093 in damages to Plaintiffs, consisting of $ 2,250,000 of product payments, lost profits, and other out of pocket costs, less the $238,907 for product actually provided, as well as growing damages due to incurred legal fees, loss of future profits, damage to the company's reputation, and interest on the money stolen from NDL by Defendants Harten, APS, and Peck.

## COUNT II: VIOLATION OF 18 USC SECTION 1962(d) BY CONSPIRACY TO VIOLATE 18 UNITED STATES CODE SECTION 1962(c).

194.    Plaintiffs hereby incorporate into this paragraph all other factual allegations in this Complaint as though fully set forth herein.

195.    Each Plaintiffs is a "person" within the meaning of 18 United States Code §§ 1961(3) and 1964(c).

196.    Each Defendant is a "person" within the meaning of 18 United States Code §§ 1963(3) and 1962(c).

197.    The Enterprise constituted an "enterprise" within the meaning of 18 United States Code §§ 1961(4) and 1962(c), and was engaged in legitimate and illegitimate activities affecting interstate and international commerce at all relevant times.

198.    Between April 2012 and the present date, in the District of Columbia and elsewhere, Defendants Harten, Peck, Farah, Marysol, Pasquale, Vidaurre, Bedregal, Pozo, Salazar, Urteaga, Javier, Gonzalo, Ofelia, Jorge Sr., and Jorge Jr, as well as APS, SKE, Convalor/Confactor, and C&V Exports were associated with the Enterprise and knowingly and intentionally combined, conspired, and agreed to violate 18 United States Code § 1962(c). Otherwise stated, the named Defendants participated, both directly and indirectly, in conducting the Enterprise's affairs through a pattern of racketeering activity.

199.    Specifically, beginning in April 2012, Defendants Harten, Farah, Pasquale, Peck, Jorge Sr., and Jorge Jr, as well as APS, SKE, and C&V Exports directly participated in the Enterprise because they agreed, at various times, to facilitate and further the fraud conspiracy by actively engaging in mail fraud and wire fraud, as well as traditional fraud. The named Defendants actively engaged in mail fraud, wire fraud, and money laundering by sending fraudulent invoices, misrepresentations and other false information regarding agricultural goods

shipments and agreements, intending for the Plaintiffs to transmit funds for which Defendants represented would be used for the purchase of goods that would be exported from Peru or otherwise cover-up the fact that Defendants were engaged in a fraudulent scheme.

200.    Beginning in April 2012, Farah participated in this conspiracy by introducing Plaintiffs to and then vouching for Defendants Harten and APS, who lured Plaintiffs into several sham transactions by which Harten and APS intended to defraud Plaintiffs.  Over the next two years, Defendants Farah, Pasquale, Peck, Jorge Sr., and Jorge Jr, as well as SKE and C&V Exports assisted in perpetrating these frauds and covering up the fraudulent scheme.

201.    The specific pattern of racketeering activity, through which the above Defendants agreed to conduct the Enterprise's affairs, consisted of multiple overt acts indictable under:

      a.      18 U.S.C. § 1341: Mail Fraud.  Several instances of mail fraud in violation of 18 United States Code § 1341 by executing, and attempting to execute, a scheme to defraud and to obtain money and property by means of false pretenses and misrepresentations, using the mails to satisfy U.S. customers of NDL.

      b.      18 U.S.C. § 1343: Wire Fraud.  Multiple, repeated, and continuous instances of wire fraud in violation of 18 United States Code § 1343 by executing, and attempting to execute, a scheme to defraud and to obtain money and property by means of false pretenses and misrepresentations, using interstate wire communications.

      c.      18 U.S.C. § 1956: Money Laundering.  Multiple, repeated, and continuous instances of money laundering in violation of 18 United States Code § 1956 by knowingly using proceeds generated from an unlawful activity, conducts a financial transaction with the intent to carry on of the unlawful activity and conceal the nature, source, ownership, or control of the unlawful proceeds.

202.    Plaintiff suffered injury to its business within the meaning of 18 United States Code § 1964(c) because of Defendants' racketeering activities.

203.    Defendants racketeering activities injured Plaintiff who were defrauded of significant funds that were conveyed to Harten and APS in order to because they used to purchase agricultural goods for export from Peru, but all Defendants knew that Harten and APS never intended to honor these obligations.

204.    As a direct and proximate result of Defendants' above-named racketeering activity, Plaintiffs' suffered irreparable damage, incurring severe monetary losses and lost business opportunities.

205.    Specifically, Defendants Harten, Peck, Farah, Marysol, Pasquale, Vidaurre, Bedregal, Pozo, Salazar, Urteaga, Javier, Gonzalo, Ofelia, Jorge Sr., and Jorge Jr, as well as APS, SKE, Convalor/Confactor, and C&V Exports' violation of 18 United States Code § 1962(c) caused $2,011,093.00 in damages to NDL.

## STATE LAW ALLEGATIONS

### COUNT III: COMMON LAW CONSPIRACY TO COMMIT FRAUD

206.    Plaintiffs hereby incorporate into this paragraph all other factual allegations in this Complaint as though fully set forth herein.

207.    Between April 2012 and the present date, Defendants Harten, Peck, Farah, Marysol, Pasquale, Vidaurre, Bedregal, Pozo, Salazar, Ofelia, Jorge Sr., and Jorge Jr, as well as APS, and SKE conspired to commit fraud against NDL by creating sham agricultural sales transactions and inducing Plaintiffs to advance monies for the purchases of these goods and then vouching for these sham transactions as if they were legitimate.  NDL did not know that it was

being defrauded in this manner until it was too late to recover its losses.

208.    Specifically, Defendants Harten, Farah, Pasquale, Peck, Jorge Sr., Jorge Jr,

Vidaurre, Bedregal, Pozo, and Salazar as well as APS, SKE, and C&V Exports conspired

together to provide the perception of legitimacy to APS and validate the perception that these

were legitimate transactions.  They were assisted in this attempt to validate the legitimacy of

APS by Ofelia, Javier, and Gonzalo, despite their knowledge that APS was corrupt.

209.    Defendant Farah participated in this conspiracy by recruiting Plaintiffs for sham

transactions and vouching for the legitimacy of Harten and APS, despite the fact that he knew

that Harten had defrauded Farah himself.  Farah engaged in these actions in order to attempt to

recover some of the monies which he had lost to Harten's scam transactions.

210.    Similarly, Defendant Peck participated in the conspiracy by vouching for the

legitimacy of Harten and APS, despite the fact that they knew that Harten had defrauded their

company SKE.  Peck engaged in these actions in order to attempt to recover some of the monies

which SKE had lost to Harten's prior scam transactions.

211.    Defendants Marysol, Pasquale, Ofelia, Gonzalo, Javier, Jorge Sr., and Jorge Jr.

participated in the conspiracy by vouching for the legitimacy of Harten and APS, despite the fact

that they knew that Harten and APS were engaging in fraud and Jorge Sr., and Jorge Jr. had

directly assisted Harten in the fraud by turning him loose from the restrictions originally imposed

on Harten's ability to access APS funds.

212.    Defendants APS and SKE furthered the conspiracy by permitting themselves to

be used as the vehicles in which Defendants fraudulently acquired and sold properties, and/or

engaged in falsifying the financing of real estate transactions.

213.    Defendant C&V Exports furthered the conspiracy by accepting proceeds from one

of Harten's transactions that defrauded Plaintiffs.  Defendants Urteaga and Collinsville Corp. knowingly accept the tainted proceeds of this conspiracy.

214.    Defendants Harten, Peck, Farah, Marysol, Pasquale, Vidaurre, Bedregal, Pozo, Salazar, Urteaga, Javier, Gonzalo, Ofelia, Jorge Sr., and Jorge Jr, as well as APS, SKE, Convalor/Confactor, and C&V Exports' common law conspiracy to commit fraud caused approximately $2,011,093.00.

## COUNT IV: FRAUD

215.    Plaintiffs hereby incorporate into this paragraph all other factual allegations in this Complaint as though fully set forth herein.

216.    Starting in April 2012, Defendants Harten, Farah, Marysol, Peck, Pasquale, Jorge Sr., Jorge Jr, Ofelia, Javier, Gonzalo, Vidaurre, Bedregal, Pozo, Salazar each made specific representations supporting the validity of APS and the sham transactions in order to defraud Plaintiffs.

217.    The purpose of these misrepresentations were to commit fraud against NDL by creating sham agricultural sales transactions and to induce Plaintiffs to advance monies for the purchases of these goods.

218.    Plaintiffs reasonably relied upon these representations.

219.    Based upon these representations, Plaintiffs advanced monies for these transactions.  Plaintiffs did not know that it was being defrauded in this manner until it was too late to recover its losses.

220.    Defendants' acts were willful and wanton and specifically intended with malice to injure Plaintiffs.

221.    As a result of these misrepresentations, Plaintiffs were injured in the amount that

they advanced for these agricultural goods which were not delivered.  The frauds that Defendants Harten, Farah, Marysol, Peck, Jorge Sr., Jorge Jr, Ofelia, Pasquale, Javier, Gonzalo, Vidaurre, Bedregal, Pozo, Salazar, APS, and SKE directly caused approximately $2,011,093.00 in damage to Plaintiffs.

## COUNT V: BREACH OF CONTRACTS

222.    Plaintiffs hereby incorporate into this paragraph all other factual allegations in this Complaint as though fully set forth herein.

223.    Defendant APS, through its puppet masters Peck and Harten, entered into various contracts as described above, especially in Table 1.0, promising to provide agricultural goods in exchange for payments by Plaintiffs.

224.    Peck, Harten, and APS failed to honor their promises regarding the provision of these agricultural goods.

225.    Plaintiffs substantially performed all of their duties under the Agreement.

226.    Defendants Peck, Harten, and APS have no legal justification for not honoring their obligations under these contracts.

227.    Therefore, Defendants Peck, Harten, and APS are liable for breaching this Agreement and should be subject to all of the monetary damages set forth under the Agreement – APS directly and Peck and Harten for violating the corporate veil that should have existed at APS.

228.    Defendants Peck, Harten, and APS have injured Plaintiffs by these breaches of contracts in the amount of approximately $2,011,093.00.

### SPECIFIC CLAIMS FOR RELIEF AND PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against each and all Defendants, jointly and severally, as follows:

1.      For threefold the damages sustained by Plaintiff, resulting in compensatory damages of approximately $6,033,279.00, as well as costs of investigation, costs of this suit, and reasonable attorneys' fees, pursuant to 18 United States Code § 1964(c), together with pre- and post-judgment interest, against all Defendants found to have violated any part of 18 United States Code § 1962;

2.      For equitable relief, as may be appropriate in accordance with 18 United States Code § 1964(a);

3.      For the damages sustained by Plaintiffs, resulting in compensatory damages of approximately $2,011,093.00, as well as costs of this suit, and reasonable attorneys' fees, for conspiracy to defraud against all Defendants, together with pre- and post-judgment interest, and further awarding Plaintiff punitive damages of $10 million, against all Defendants found to have engaged in this conspiracy;

4.      For damages sustained by Plaintiff resulting in compensatory damages of approximately $2,011,093.00, with pre- and post-judgment interest, and further awarding Plaintiff punitive damages of $10 million against all Defendants found to have willfully and wantonly engaged in fraud;

5.      For damages sustained by Plaintiff resulting in compensatory damages of approximately $2,011,093.00, with pre- and post-judgment interest, against Defendants Peck, Harten and APS if found to have breach several contracts with Plaintiffs; and

6.      For such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury of any and all issues triable of right.


Respectfully submitted this 30th day of October, 2015,


**Plaintiffs Nuevos Destinos, LLC, Nuevos Destinos Peru, S.A.C., and William P. Cook**
*By Counsel*


THE LAW FIRM OF URBAN & FALK, PLLC
Thomas F. Urban II, Virginia Bar No. 40540
P.O. Box 321043
Alexandria, VA 22320
(703) 861-5235
FAX (703) 340-1450
Urban_law@yahoo.com